**DISTRICT OF COLUMBIA, a Municipal Corporation, and Albert Ramirez, Appellants,**

**v.**

**Irene DOWNS, Administratrix of the Estate of Gary Downs, a Deceased minor, Appellee.**

**No. 8895.**

District of Columbia Court of Appeals.

Argued May 13, 1975.

Decided May 24, 1976.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time the brief was filed, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellants.

William W. Graham, Washington, D. C., with whom David Povich, Washington, D. C., was on the brief, for appellee.

Before REILLY, Chief Judge, and KELLY and KERN, Associate Judges.

KERN, Associate Judge:

At approximately 6 o'clock on the evening of September 17, 1971, appellant Ramirez, a Metropolitan policeman, accompanied by two other officers, shot and mortally wounded Gary Downs,[1] who was unarmed, in the bedroom of an apartment during their search for narcotics and narcotics paraphernalia pursuant to a search warrant which is conceded to have been valid.[2]

Appellee, the mother of decedent and administratrix of his estate, brought suit against Officer Ramirez and the District of Columbia[3] under the Wrongful Death Act and the Survival Statute, D.C.Code 1973, §§ 12-101 and 16-2701, alleging that they had been negligent in using excessive force under the circumstances and that their negligence was the proximate cause of her son's death. After a jury found in her favor, the trial court denied defendants' motions for a new trial and judgment notwithstanding the verdict, and this appeal followed.

The defense case consisted of testimony by Officer Ramirez that he had seen a trail of white powder on the bedroom floor leading to the closet, and as he moved in that direction out burst Downs toward him.[4] Ramirez pushed Downs away and drew his revolver, but Downs came back at him once more and reached for that revolver, and appellant pushed him away for the second time. The next time Downs sought to grab his gun, appellant shot him. Downs fell face down on the floor of the bedroom (not the closet) and did not move again. At about that time Ramirez's shirt was observed to be torn and his side scratched and

bleeding. The other officers confirmed the facts of the struggle and the shooting, but one had not seen Downs come out of the closet, and the other had not seen the shots fired. The defense theory was that Ramirez, given Downs's aggressive behavior and relative superiority in size, had reason to fear death or serious bodily injury and therefore was justified in shooting him.

Appellee's case consisted of testimony by decedent's brother and mother that upon going to the apartment some hours after the fatal shooting, they saw stains of what appeared to them to be blood on the floor of the bedroom *closet* and on the chest of drawers near that closet as well as on the floor of the bedroom. Photographs taken by the brother depicting such stains were received in evidence.

There was expert testimony presented. The Deputy Medical Examiner testified that (1) the fatal bullet entered the heel of Downs's hand, passed through it and re-entered Downs's chest at a downward angle of 45° and (2) in view of the nature of the mortal wound, only a few drops of blood could have splattered beyond the area where Downs fell and lay after appellant shot him.

A forensic serologist testified that scrapings allegedly taken from the closet floor *at the time of trial* did contain blood although he could not say whether it was human or animal given the contamination of the sample over the passage of time.

Certain other circumstances were also presented to the jury. First, when decedent was examined at the hospital, no hair, fibers or foreign skin were found under his fingernails. Second, the officer charged with the responsibility of collecting evi-

1. Downs died in Rogers Memorial Hospital shortly after being taken there from the scene of the shooting.

2. The officers had no arrest warrant for Downs and there was no evidence that they even knew of his presence in the apartment which belonged to decedent's half-brother.

3. The other two officers were also defendants in the suit, but the court directed verdicts in their favor.

4. The officer was approximately 5′6″; Downs was about 6′.

dence and photographing the scene of the shooting took more than 60 pictures of the apartment, but in none was the bedroom closet door open more than an inch. This same officer also had taken possession of the sample blood scrapings about which the serologist had testified at trial; he then pointed out to the expert witness that there had been a mix-up in the sample scrapings and as a result of his suggestion, the expert was recalled to the stand during trial and changed his testimony.

A homicide officer responding to the scene denied in his testimony that he had seen any blood on the floor of the closet, but his own notes contained a reference to "blood on the closet door and floor." He also was seen, according to a witness, in conversation with appellant Ramirez and the other two officers shortly after the shooting, although the normal procedure in a homicide case, about which the homicide officer should have known, was to keep witnesses separated to avoid the possibility of their concocting together a story.

Finally, Chapter II, § 29 of the Rules and Regulations of the Metropolitan Police Department was received in evidence; it provides in pertinent part:

(a) [E]ach member of the department shall . . . use only the minimum amount of force . . . consistent with the accomplishment of his mission, and shall exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms.

(b) No member of the . . . Force shall discharge a firearm . . . except . . . (1) to defend himself . . . from an attack which the officer has reasonable cause to believe could result in death or serious bodily injury. . . .

Given the evidence adduced, the plaintiff's theory was either (1) that Downs never even left the closet but while still crouched down with his hand extended upwards to protect himself was shot there and then carried to the middle of the bedroom by the officers, or (2) that Officer Ramirez, given the number of policemen and their weapons and the fact that Downs was unarmed, used excessive force in shooting him.

The trial judge, after instructing the jury concerning the meaning of the terms "negligence" and "assault",[5] then charged:

. . . [W]hether he [appellant Ramirez] committed an assault as distinguished from negligence is dependent upon whether what he did he did deliberately, or whether he did it without intent, deliberate intent. But, did it accidentally or by failure to exercise the prudence that might be expected of him in the situation, assuming he is an ordinary, reasonable, prudent person.

Now then, I want to tell you that in addition to the verdict that you must render in this case, I'm going to put to you now that I have told you about assault, and the defense to it, and I have told you about negligence, and the defense to it. . . . I'm going to submit to you two questions. These questions will be answered yes or no. And before I ask for your general verdict, I am going to have my Clerk put to you the two questions that are called special interrogatories. . . . I'm going to ask you in substance, did defendant, Ramirez, commit the tort of assault, and did Ramirez commit the tort of negligence? And the way I've got these worded, is one: do you find the defendant, Ramirez, committed the tort of assault on the deceased, and that said tort was the proximate cause of death? And

5. At the end of the trial, plaintiff moved to amend her complaint under Rule 15 to include one count of assault and battery under both the Wrongful Death Act and Survival Statute, supra. Her motion was conditionally denied, and instead, special interrogatories were propounded to the jury by the trial court.

two: do you find that the defendant, Ramirez, committed an act of negligence, and that said act was the proximate cause of the death of the deceased?

Those two questions will be asked you, and you will be called upon to supply an answer of either yes or no to each of them before you are called upon for your general verdict. [Emphasis added.]

When the jury, after deliberation, returned with its verdict, the trial judge asked first for its answer to his two interrogatories. The foreman reported that their answer was "no" to the first, *viz.*, did Ramirez commit the tort of assault on decedent and was that the proximate cause of his death, and "yes" to the second, *viz.*, did Ramirez commit an act of negligence and was that act the proximate cause of the death of decedent.

Appellants argue that "the pivotal issue was whether Officer Ramirez, in shooting the decedent, used excessive and unjustified force . . . but to state the question in that manner is to do nothing more than ask whether or not Officer Ramirez *assaulted* the decedent. . . . [W]hen the jury answered it in the negative, the jury of necessity exculpated appellants from fault." [Emphasis added.] Appellants argue, therefore, that they were entitled to judgment.

■ We think appellants misconceive the meaning of the jury's answers to the court's special interrogatories. These interrogatories, when viewed in the context of the court's instruction, posed to the jury whether Ramirez deliberately and intentionally shot Downs or whether the shooting resulted from the failure of Ramirez to act as a reasonably prudent person would under the circumstances of his confrontation with Downs. The jury answered that Ramirez did not assault Downs in the sense of deliberately shooting him, but that he did

act negligently and his negligence was the cause of the death of Downs. Given the testimony which we have outlined above we are unable to say there was insufficient evidence to support the jury's verdict.

Appellants also complain that even if the trial court was correct in "submitting the case to the jury on a negligence theory, the court nonetheless erred in failing to instruct the jury on the question of decedent's contributory negligence." Specifically, appellants contend the ". . . evidence discloses that the decedent repeatedly came at Officer Ramirez and, instead of curtailing his efforts in this regard after the officer drew his revolver, attempted to disarm the officer. Therefore, the evidence presented a question of fact, if not one of law, as to the decedent's contributory negligence under any fair application of that doctrine."

■ Appellee responds that appellants failed (1) to submit a proposed instruction in writing to the court at the appropriate time as required by Super.Ct.Civ.R. 51 and (2) to argue that specific defense in their case.[6] Our review of the record indicates that the court carefully instructed the jury that if it found the officer reasonably feared death or serious bodily harm as a result of Downs's physical attacks, then it could not find appellants liable. Thus, the theory of the defense, *viz.*, that Downs's own actions justified the response of Ramirez and absolved both the District and him of liability, was clearly put before the jury. Accordingly, we fail to see how appellants were harmed by the court's action which they appeared to accept without further objection at trial.

In sum, we find no prejudice incurred by appellants from the court's failure to read the standard instruction on contributory negligence in light of (1) the untimely request by the defense for that instruction

6. The defense, as we have noted, was that Downs continued to attack Officer Ramirez after the officer had drawn his pistol, and

because of their size differential and the implacable nature of the attack Ramirez was finally obliged to shoot him.

and (2) the presentation to the jury of the defense theory of justifiable use of force in light of Downs's own action. Accordingly, we conclude there was no error requiring a reversal and the judgment must be affirmed. *See Miller v. Avirom,* 127 U.S. App.D.C. 367, 384 F.2d 319 (1967).

*Affirmed.*