**DISTRICT OF COLUMBIA, Joyce Powell, and Eric Winer, Appellants,**

v.

**Indiana EVANS, Individually and as Personal Representative of the Estate of Virtus A. Evans, Deceased, Appellee.**

**Indiana EVANS, Individually and as Personal Representative of the Estate of Virtus A. Evans, Deceased, Cross–Appellant,**

v.

**DISTRICT OF COLUMBIA, Joyce Powell, and Eric Winer, Cross–Appellees.**

**Nos. 92–CV–1323, 94–CV–451.**

District of Columbia Court of Appeals.

Argued April 19, 1994.
Decided July 21, 1994.

---

Edward E. Schwab, with whom John Payton, Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, were on the brief, for appellants.

Perry A. Hilbert, Jr., with whom Allan Sosslau and William L. Kohler were on the brief, for appellees.

Before FERREN * and TERRY, Associate Judges, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

This is a police shooting case which resulted in a $612,828 judgment against the two police officers involved, Eric Winer and Joyce Powell, and against the District of Columbia. The principal basis for this award was a 42 U.S.C. § 1983 (1993) claim that the officers and the District violated the decedent's Fourth Amendment right against unreasonable seizures. The jury also found for the plaintiff—the mother of the victim, Virtus Evans, and the personal representative of his estate—on wrongful death, survival, and negligent infliction of emotional distress claims. The jury found for the defendants on the assault and battery claim. The trial judge dismissed plaintiff's other claims, which were all based on negligence.

We conclude that the officers are entitled to immunity from the § 1983 suit and that, as a result, the District is not subject to § 1983 liability. Accordingly, we must reverse the judgments totaling $562,828 in plaintiff's favor on that claim, as well as on the wrongful death and survival claims, which were predicated on the § 1983 claim. We uphold, however, the jury's verdict awarding $50,000 to plaintiff for negligent infliction of emotional distress. We also conclude that the trial court erred in dismissing plaintiff's negligence claims. We therefore reverse and remand for a new trial on those claims alone.

---

* Judge FERREN was *Acting Chief Judge* at the time of argument. His status as an *Associate Judge* resumed on June 14, 1994.

## I. FACTS

Metropolitan Police Department Officers Eric Winer and Joyce Powell shot and killed Virtus Evans after a confrontation at his home. The facts were hotly contested at trial; the dispute centered on whether the victim possessed a butcher knife at the time he was shot.

### A.

The plaintiff's version of what happened, based primarily on the testimony of the plaintiff-appellee herself, Indiana Evans, the victim's mother, is as follows. Virtus Evans, who was 37 years old at the time of the shooting, had a long history of epileptic seizures. He lived with his mother, who had been accustomed to dealing with her son's seizures since he was two years old. On May 24, 1986, Ms. Evans returned home to find her son attempting to get out of the locked back door of their home without using a key, in spite of the fact that he had the key with him. Ms. Evans asked her son what was wrong and inquired whether he had taken the medicine he used to control his epilepsy. He did not respond, and in the next few moments he twice fell down attempting to walk across the kitchen floor. At this point, Ms. Evans, feeling that she needed assistance, went to a neighbor's house to dial 911. She testified that she told the emergency operator, "My son is having a seizure. I'm home alone and need some help." Ms. Evans then returned to her own home to check on her son, whom she found sitting in the kitchen, apparently "a little better."

Approximately five minutes later, a fire truck with five firefighters arrived at the scene. Ms. Evans told them that she had requested an ambulance to give medical help because her son was "having a seizure." Two firefighters followed Ms. Evans to the kitchen to check on her son. According to Ms. Evans, upon seeing Virtus Evans, one of the firefighters said, "He's on drugs." At this point Virtus Evans was not out of the seizure, but he had calmed down.

When the firefighters entered the house with Ms. Evans, they encountered Virtus Evans trying to eat a watermelon. He had a large knife, and watermelon pieces and juice were scattered all over the counter and the floor. The firefighters continued to exclaim that Virtus Evans was on drugs, "probably PCP." After about five minutes, fearing Evans would hurt himself, one of the firefighters took the knife away from him and gave it to his mother, who placed it behind a chair in the living room. According to Ms. Evans, her son never entered the living room during the entire incident.

Virtus Evans then left the kitchen and stepped into an alley behind the house. According to his mother, he had nothing in his hands at this time. After another couple of minutes had passed, Ms. Evans heard sirens and decided to wait outside her house for more help to arrive. She testified that she next saw a police officer, later identified as defendant Joyce Powell, running through the alley, "moving very fast," with her gun drawn. Officer Powell passed Ms. Evans without speaking, although Ms. Evans testified that she had told the officer her son was an epileptic. Ms. Evans testified that, upon hearing this, Officer Powell looked directly at Ms. Evans, as if to acknowledge the statement.

Ms. Evans further testified that she then followed Officer Powell into the back yard, where she saw her son approaching. She heard Officer Powell say "Drop it" twice. Virtus Evans stumbled toward Officer Powell, who backed up and raised her gun. Ms. Evans testified that her son's hands were hanging loosely at his side at the time, and that he held nothing. She said that her son was at least ten feet away from Officer Powell when the officer fired her weapon at him. Just before Officer Powell fired, Ms. Evans saw Officer Winer for the first time. At that point, before the actual shooting, fearing for her own safety, Ms. Evans placed her hands over her eyes, screamed, and either fell or was knocked to the ground. She heard a number of shots and later learned that her son had been killed by shots fired by both Officer Winer and Officer Powell.

In addition to Ms. Evans' testimony, the plaintiff presented two other eyewitnesses who testified that events outside the house occurred much as Ms. Evans had described.

They, too, testified that Virtus Evans had nothing in his hands before he was shot. These other eyewitnesses also testified that Virtus Evans never threatened Officer Powell in any way.

Plaintiff also called Daniel Beach, one of the firefighters who was on the scene, as a witness in her case-in-chief. Unlike plaintiff's other witnesses, Beach testified that Virtus Evans did have a knife at the time he was shot. Beach added, however, that Evans never acted in a threatening way toward any other person present, but that he had "jabbed at himself" with the knife several times. Beach also testified that Officer Winer had told Evans to drop the knife.

### B.

The District of Columbia defendants-appellants presented a much different version of the facts through the testimony of firefighters at the scene and of Officers Winer and Powell. Allan Russell, one of the firefighters, testified that Ms. Evans had told him that her son was "acting crazy" and that she was afraid to go into the house. According to the testimony of defendants' witnesses, when the firefighters first entered the house, encountering Virtus Evans with the knife and the watermelon, they attempted to take his vital signs but Evans would not cooperate. The firefighters spoke with Evans for about 15 minutes without getting a response. During this time, they were able to get the knife from him and give it to his mother. Eventually, Evans told the firefighters to "get away from him."

At this point, according to the firefighters' testimony, Evans pulled another butcher knife from his shirt and told everyone to back off. Evans then left the kitchen and went into the back yard, where he "lunged" at firefighters Lee Mason and Allen Russell with this second knife. Russell hopped over a fence to avoid the knife thrust. While this was occurring, firefighter Beach called for police assistance, sending over the radio a "firemen in trouble" dispatch which said they were dealing with a person with an "altered mental status."

Shortly thereafter, Officer Eric Winer arrived at the scene. According to Winer's testimony, the firefighters told him that a man in the alley with a knife had acted threateningly toward them. Officer Winer then proceeded to the alley, where he saw a man later identified as Virtus Evans with a butcher knife. Officer Winer kept a short fence between himself and Evans and used the radio to call for a taser (stun gun). Evans continued to act strangely and did not respond to the officer's pleas to drop the knife. At one point, Evans jabbed himself in the stomach with the knife. Shortly after that, Evans started to climb the fence that separated him from Officer Winer. At that point Winer aimed his gun and yelled, "Stop, it's not worth it. Don't do it this way." According to Winer, Evans backed off of the fence and retreated down the alley, heading toward a young girl. Winer distracted Evans by shaking the fence. Evans then approached Winer and fell to the ground, seemingly onto the knife. Winer holstered his weapon and jumped the fence to approach Evans. Suddenly, according to Winer, Evans stood up and brandished the knife. Officer Winer backed away and continued to plead with Evans to drop the knife.

This was the time when Officer Joyce Powell arrived at the scene. She knew another officer was there. Firefighters also told her a man was there armed with a knife. The officer testified that she ran to the back of the house holding her baton. Officer Powell added that she did not remove her gun from its holster until she reached a point where Evans was standing in front of her. At that point, she jumped back and to the left, pulling her weapon.

According to the officers' testimony, Virtus Evans approached Officer Winer for a moment, then moved toward Officer Powell, bringing the knife up into a striking position. Powell jumped back, telling Evans to drop the knife. When Evans started to move toward her more quickly, both she and Officer Winer opened fire, killing Evans. Throughout the time Officer Powell was at the scene, Officer Winer and the firefighters were pleading with Evans to drop the knife. Both officers testified that they feared for

Officer Powell's life when they fired on Evans.

The main factual dispute between the parties, therefore, is whether Virtus Evans had a knife and was threatening others, including the two police officers, when Officers Powell and Winer shot him. It is important to note in this connection that counsel for plaintiff Evans conceded in closing argument that both officers believed that Virtus Evans had a knife.

## II. PROCEDURAL HISTORY

As a result of this shooting, Indiana Evans filed a ten-count complaint against Officer Winer, Officer Powell, and the District of Columbia stating several theories of liability. At least six of the counts alleged various types of negligence, including the District Columbia's failure to properly "train, manage, and supervise" 911 staff, the firefighters, and the police. The complaint also alleged that the firefighters had been negligent in failing to get immediate medical help for Virtus Evans, and that the police had been negligent in their approach to the scene, especially in their actions that allegedly resulted in further agitating Virtus Evans, rather than calming him down. The complaint also included an assault and battery count, filed on behalf of Virtus Evans' estate, a wrongful death action pursuant to D.C.Code § 16–2701 (1989), and a survival action pursuant to D.C.Code § 12–101 (1989). Further, Ms. Evans sued for "negligent and/or intentional infliction of emotional distress." Lastly, Ms. Evans filed a 42 U.S.C. § 1983 [1] claim against all defendants, alleging that the officers and the District had violated Virtus Evans' Fourth Amendment right to be free from unreasonable seizures.

At trial, Judge Dixon granted the defendants [2] motion for directed verdict on all the negligence counts. He allowed the jury to hear all the other counts, namely, the wrongful death and survival actions, the assault and battery claim, and the § 1983 claim.

The jury returned a verdict in plaintiff's favor on all counts it heard except for assault and battery, for which it found in the defendants' favor. By means of a special verdict form, the jury awarded Ms. Evans $500,000 to cover both the § 1983 claim and the survival action, $50,000 on the infliction of emotion distress claim, and $62,828 on the wrongful death action. This verdict form did not list the three defendants separately; the verdict was assumed to award damages collectively against all three defendants: Officer Powell, Officer Winer, and the District of Columbia.

Judge Dixon then granted the District's Motion to Alter or Amend Judgment, concluding that, as a matter of law under *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the District of Columbia could not be held liable for damages under § 1983 because the District was not a "state or territory." [3] Judge Dixon, however, did not undo the § 1983 award against the two officers; he rejected the officers' claim that they were entitled to immunity from a § 1983 claim under the doctrine of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Officers Powell and Winer appeal the denial of their defense of immunity under *Harlow*; they contend that the judgment against them under § 1983 cannot stand as a matter of law. Further, all appellants argue that, if the officers are immune from the § 1983

---

**1.** 42 U.S.C. § 1983 (1993) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of

Columbia shall be considered to be a statute of the District of Columbia.

**2.** One attorney represented both police officers and the District throughout this action.

**3.** *Carter*, however, had been overruled by statute when Congress amended 42 U.S.C. § 1983 in 1979 to include, in addition to "state or territory," the words "the District of Columbia." See *supra* note 1. It has been legally possible, therefore, to subject the District to liability under § 1983 since that time.

claim, all appellants, including the District, are entitled to reversal of the judgments on all the remaining counts because those judgments were premised solely on the validity of the § 1983 claim against the officers.

Ms. Evans filed a cross-appeal challenging Judge Dixon's ruling that the District could not be held liable under § 1983. She also has cross-appealed the directed verdict against her negligence claims. Finally, she challenges another judge's earlier ruling that vacated default judgments against the police officers and thereby allowed this case to proceed to trial.

### III. QUALIFIED IMMUNITY FROM CIVIL SUIT

▮ Appellants contend that Officers Powell and Winer, as well as the District of Columbia, are entitled to immunity from 42 U.S.C. § 1983 liability. See *supra* note 1. In *Harlow,* plaintiff brought suit for damages based on his allegedly unlawful discharge from employment in the Department of Air Force. Defendant, a senior aide to former President Nixon, argued that he was entitled to immunity from civil suit. The Supreme Court concluded that presidential aides were not entitled to absolute immunity; rather, they were entitled to "qualified immunity." Governmental officials performing discretionary functions, accordingly, are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known about. See *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

### A.

▮ The Supreme Court built on *Harlow*'s "qualified immunity" doctrine, as applied to police conduct, in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), a § 1983 case where the Court attempted to clarify what *Harlow*

meant by a "clearly established" constitutional right. *Anderson* was a warrantless search and seizure case, based on "exigent circumstances," in which the Court held that a police officer is entitled to summary judgment on qualified immunity grounds if the officer can establish, as a matter of law, that he or she reasonably could have believed that the search comported with the Fourth Amendment, even though it actually did not. The Court did not question the proposition that freedom from illegal searches and seizures is a "clearly established" constitutional right. The Court, however, stressed the particularity with which a plaintiff must allege a violation of a constitutional right under § 1983:

> It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. The same is true of their conclusions regarding exigent circumstances.

*Id.* at 641, 107 S.Ct. at 3039–40 (citation omitted). In short, *Anderson* stands for the proposition that "[t]he contours of the [constitutional] right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. Absent such clear understanding, the law enforcement officer will be immune from § 1983 liability for reasonable but mistaken conduct.[4] The law accordingly has evolved to a

---

4. There is some question in the federal circuit courts of appeal whether the judge or the jury should decide whether the officers violated "clearly established" law. *Compare Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir.1988) (treating as a triable issue of fact "whether a reasonable [police] officer placed in the circumstances faced by [the defendant] could reasonably believe that his conduct was legal") *and Melear v. Spears,* 862

F.2d 1177, 1184 (5th Cir.1989) ("the trier of fact must determine the objective legal reasonableness of an officer's conduct by construing the facts in dispute"), *with Coffman v. Trickey,* 884 F.2d 1057 (8th Cir.1989) (reversible error to submit question of availability of qualified immunity to the jury), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990); *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.) (treating qualified im-

point where, in order to be subject to § 1983 liability, an officer's acts must clearly violate a clearly established right.

This point is further illustrated by another § 1983 case, *Gooden v. Howard County,* 954 F.2d 960 (4th Cir.1992). In *Gooden,* police officers took the wrong person into custody after hearing multiple screams and crashing coming from inside an apartment. The acoustics of the building, however, were such that the officers entered the wrong apartment and thus took the wrong person into custody. As in the present case, witnesses gave differing versions of what actually had happened. The court held that, no matter which version was actually true, the officers were immune from a § 1983 suit under *Harlow*'s qualified immunity.

The *Gooden* plaintiff argued that there were three reasons for denying qualified immunity. Two are relevant to this case: "(1) the presence of disputed facts as to what actually transpired on the evening of March 2; (2) the fact that the ultimate judgment of the officers with respect to Ms. Gooden was a mistaken one...." *Id.* at 965. The court rejected both arguments:

> In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place. It will nearly always be the case that witnesses to a crime differ over what occurred. That inevitable confusion, however, need not sig-

nify a difference of triable fact. What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced.

*Id.*

 Without question, then, qualified immunity can provide a valid defense to a § 1983 claim for excessive use of force.[5] In *Slattery v. Rizzo,* 939 F.2d 213 (4th Cir.1991), former Justice Powell, sitting as a circuit judge, noted that, aside from the Sixth Circuit, "all other courts of appeals that have addressed this issue directly have held that qualified immunity is available in such cases." *Id.* at 215–16 (footnote omitted); *see Thorsted v. Kelly,* 858 F.2d 571, 573 (9th Cir.1988); *Brown v. Glossip,* 878 F.2d 871, 873–74 (5th Cir.1989); *Finnegan v. Fountain,* 915 F.2d 817, 822–23 (2d Cir.1990).[6] *Slattery* summarized the law in the following manner: "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his [or her] conduct was lawful." *Slattery,* 939 F.2d at 216 (citing *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40).

In this case, rather than the warrantless search in *Anderson,* there was the ultimate warrantless seizure: the shooting of Virtus Evans. Just as the Supreme Court acknowledged in *Anderson* that police officers can "reasonably but mistakenly conclude that

munity as a legal question for the court but encouraging use of special interrogatories to the jury on underlying factual issues), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990), *and Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990) (treating availability of qualified immunity as legal question for the court). Because we conclude as a matter of law that there was no "clearly established" right the officers violated in this case, we do not address this question.

**5.** Plaintiff-appellee Evans cites *Wade v. District of Columbia,* 310 A.2d 857 (D.C.1973), for the proposition that making an arrest is a ministerial, not a discretionary, function, as required for qualified immunity under *Harlow. Wade,* however, concerns torts committed by police officers and focuses on whether the District is liable on a

*respondeat superior* theory. It does not refer to § 1983 cases, let alone to what is a discretionary function within the meaning of § 1983.

**6.** Similarly, qualified immunity is a valid defense for actions based on police officers' excessive use of force under *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens,* the Court held that there was a direct cause of action available against employees of the federal government that was virtually identical to a § 1983 action against a state or municipality. In *Graham v. Conner,* 490 U.S. 386, 394 n. 9, 109 S.Ct. 1865, 1870–71 n. 9, 104 L.Ed.2d 443 (1989), the Court noted that the same analysis applies in *Bivens* actions as in § 1983 claims of excessive force. *See also Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

probable cause is present" to justify a search, *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039, we now acknowledge that police officers will often find themselves in situations where they can reasonably but mistakenly conclude that they are entitled to make a warrantless seizure. Here, unfortunately, that seizure resulted in Virtus Evans' death.

The gravity of this seizure, however, cannot properly distract us from the public policy of § 1983 advanced by *Harlow* and *Anderson*. Police officers must be able to act quickly and instinctively, albeit reasonably, when exigent circumstances call for immediate action. "[T]he basic purpose of qualified immunity ... is to spare individual officials the burdens and uncertainties of standing trial in those instances where their conduct would strike an objective observer as falling within the range of reasonable judgment." *Gooden*, 954 F.2d at 965. In other words, police officers should not be hindered by the threat of civil liability from attempting to perform their duties to the best of their abilities, as long as they are not violating clearly defined, firmly established constitutional rights.

■ The present case concerns facts similar to those of *Gooden*, and the reasoning of that case, too, applies here nicely. Even with the disputed versions of what actually happened here, this court cannot sustain a verdict that Officers Powell and Winer acted in violation of clearly established rights in these circumstances, considering the information they had available to them at the time. No one disputes that both officers believed Virtus Evans had a knife. Again, Officers Powell and Winer thus "*could* have believed that [their] conduct was lawful." *Slattery*, 939 F.2d at 216.

Ms. Evans argues, however, citing *Harlow*, that the police officers acted negligently, thereby violating her son's Fourth Amendment right against unreasonable seizures.[7] The discussion above should make clear that this level of generality as to the violation of the right—a simple reference to the Fourth Amendment—will not pass muster under § 1983. *See, e.g., Anderson*, 483 U.S. at 639–41, 107 S.Ct. at 3038–40. The violation of the right must be more precisely defined than that. We must look to a specific act of the officers to decide whether that act clearly violated a clearly established right.

If, for example, the jury had found against the officers on the assault and battery claim, that verdict would have indicated that the officers clearly had violated Virtus Evans' Fourth Amendment rights, because a police officer, acting reasonably, could not have deliberately shot Evans without just cause and still believed that that particular act did not violate Evans' Fourth Amendment rights. Deliberately shooting someone without just cause clearly violates the Fourth Amendment, and thus would preclude qualified immunity from § 1983 liability.

Unfortunately, Fourth Amendment search and seizure law is rarely that clear. This area of law is colored in shades of grey. An officer cannot always be certain that his or her actions do not violate the Fourth Amendment. This uncertainty results in rulings such as those in *Gooden* and *Anderson*, where the courts gave police officers some reasonable maneuvering room and found them immune from liability under § 1983.

In this case, therefore, Ms. Evans must point to specific behavior by Officers Winer and Powell that clearly violated the rights of

---

7. Count ten of the complaint states:

56. That Officers Joyce Powell and Eric Winer, did conspire and act in concert in violation of Title 47, United States Code, Section 1331(a), unreasonably and unnecessarily acted to deprive the deceased of life and liberty without due process of law; the right to equal protection secured by the Fourteenth Amendment; the right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment, the [Fourth Amendment] right to be secure in his person and effects; the right to a trial by jury; and otherwise violated

the rights and privileges enjoyed by the deceased under the laws of the United States and the Constitution of the United States.

This wording was unfortunate in that "47 U.S.C. § 1331(a)" does not exist. After some confusion about what the statutory claim actually was, including consideration of 42 U.S.C. § 1985 (a claim similar to a § 1983 claim, but involving a conspiracy among the officials) as an option, the court treated count ten as a § 1983 claim, and plaintiff Evans focussed on the violation of her son's Fourth Amendment rights against unreasonable seizures.

her son. Because the jury verdict precludes an argument based on deliberate acts of the officers, Evans' only remaining argument is to allege that the officers' conduct was negligent, and that this negligence sustains her § 1983 claim. As discussed below, however, this argument fails.[8]

Ms. Evans claims that the officers' negligence manifested itself in two ways. First, she argues that the officers' shooting of Virtus Evans, while precluded by the jury verdict from being labelled "deliberate," was nonetheless negligent. Second, she contends that the officers, especially Officer Powell, violated Virtus Evans' Fourth Amendment rights in the way in which the officers approached the entire situation, virtually forcing themselves into a position where they would have to defend themselves.[9]

■ Assuming without deciding that the officers were, in fact, negligent under each of these theories, such negligence would not be enough to sustain Evans' § 1983 claim against the officers. Mere negligence did not violate a clearly established, sufficiently specific constitutional right of Virtus Evans in a way that created § 1983 liability. Both *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (decided the same day), establish that, at least for § 1983 claims based on Fourteenth Amendment deprivations of liberty, more than negligence is required to sustain a § 1983 action. *Daniels,* in fact, overruled the part of an earlier decision, *Parratt v. Taylor,* 451 U.S. 527, 101

S.Ct. 1908, 68 L.Ed.2d 420 (1981), which had held that a § 1983 claim did not have a state-of-mind requirement. *See Daniels,* 474 U.S. at 329–31, 106 S.Ct. at 663–65.

■ The *Daniels* state of mind requirement holds equally true for a Fourth Amendment seizure case: the law now, as Judge Dixon properly instructed the jury, is that the official must intentionally, or with reckless disregard, violate a clearly established right before a § 1983 claim is justified. *See Daniels,* 474 U.S. at 330–31, 106 S.Ct. at 664–65; *Davidson,* 474 U.S. at 347–48, 106 S.Ct. at 670–71.

In this case, considering the evidence of the frightening circumstances surrounding the officers' entry onto the scene, coupled with the jury's finding for the officers on the assault and battery claim, we cannot see how the officers could be said to have violated a clearly established right of Virtus Evans, either intentionally or with reckless disregard, by following the course of action they did. Precisely because police officers must make such crucial, life-saving decisions so quickly, they are entitled to immunity from § 1983 claims under the circumstances presented here. Officers Winer and Powell, therefore, are immune from civil liability under § 1983.

### B.

[8] The only alleged basis for tying the District of Columbia to the § 1983 claim is an alleged stipulation between the parties that,

---

8. In places, the record alludes to the "public duty doctrine" as a defense against both the § 1983 claim and the negligence claims. This doctrine deals with the question whether public officials have a duty to protect individual members of the general public against harm from third parties or other independent sources. It stands for the proposition that a simple call for help to the police or to other officials does not establish a special relationship sufficient to create an actionable duty of the official to protect the specific person who made the call. *See, e.g., Auto World, Inc. v. District of Columbia,* 627 A.2d 11, 14 (D.C.1993); *Hines v. District of Columbia,* 580 A.2d 133, 138–39 (D.C.1990); *Johnson v. District of Columbia,* 580 A.2d 140, 143 (D.C. 1990) In this case, the harm to Virtus Evans was caused directly by the officers at the scene. There is no allegation of failure to protect. The

public duty doctrine, therefore, has no relevance to this case.

9. One argument proffered by Evans is that the officers violated two District of Columbia police regulations. She argues that these regulations clearly establish a right clearly violated by the officers. Nowhere, however, does Evans allege that Officers Winer and Powell deliberately violated these regulations. The regulations are only used in an attempt to prove that the officers acted negligently, something that we have already assumed true for the purpose of argument in this § 1983 discussion. See *infra,* Part VI, for a more detailed discussion of the regulations, of Evans' theories of negligence, and of the viability of these theories as common law claims for damages against the officers.

under the doctrine of *respondeat superior*, the District would be liable if the officers were found liable. Having concluded that the officers are immune from § 1983 liability in these circumstances, the District's liability is precluded. In any event, *respondeat superior* does not apply to § 1983 actions. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (municipality cannot be liable under § 1983 under *respondeat superior* theory, but could be liable if it has policy or custom that violates § 1983); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985) (rule of *Monell* requires municipality, in police shooting case, to have "policy" or "custom" of poor police training as basis for § 1983 liability; declines to impose liability under *respondeat superior* theory).

The only way the District could be held liable under § 1983, then, would be if the District had an official "custom or policy" which led to a constitutional violation. *See City of Oklahoma City*, 471 U.S. at 818, 105 S.Ct. at 2433; *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. The only possible "custom or policy" alleged here is a failure to train the police properly. This does not sustain the District's liability under § 1983 for two reasons: (1) plaintiff-appellee Evans admitted that she had not proved a failure to train claim; and (2) in recently concluding that the Chief of Police was immune from a § 1983 claim for failure to train, this court said "there must be evidence from which a trier of fact could find a widespread pattern ́of misconduct by subordinate officers which [the Chief] reasonably may be said to have disregarded." *Fulwood v. Porter*, 639 A.2d 594, 600 (D.C.1994). Evans has alleged no such widespread pattern here. Furthermore, Evans conceded that she had no independent § 1983 claim against the District.

In sum, neither the District nor the defendant police officers, Powell or Winer, can be held liable under § 1983.

## IV. WRONGFUL DEATH AND SURVIVAL CLAIMS

Our conclusion that the officers and the District are immune from civil liability under § 1983 also requires reversal of judgments awarded on the jury's verdicts on the wrongful death and survival claims. Both of these claims were dependent on the jury's finding some kind of wrongdoing by the defendant police officers. Because the jury found for the defendants on the assault and battery claim, and because we now reverse the judgment on the § 1983 claim, and, finally, because the trial court directed verdicts for the defendants on the negligence claims, nothing remains to support the judgments for wrongful death ($67,828) and survival ($500,000). Those judgments accordingly are reversed.[10]

## V. INFLICTION OF EMOTIONAL DISTRESS

The infliction of emotional distress claim is a separate matter; it stands on its own, apart from the § 1983 action. We clarify, first, that this is a negligent, not an intentional, infliction of emotional distress claim.

Count IX of the original complaint reads:

53. That on or about May 24, 1986, the Defendants, negligently and/or intentionally, did inflict emotional distress upon the Plaintiff as a result of all acts heretofore and hereinafter complained of.

54. As a result of the negligent and/or intentional infliction acts of the Defendants, the Plaintiff suffered acute emotional distress, acute pains in the body and mind, acute fear of police officers, acute shame, humiliation and distress, and she was otherwise injured and damaged.

Plaintiff presented no evidence that the police officers had intentionally inflicted any harm on Ms. Evans. There was nothing to show that the officers purposefully shot Ms.

---

10. Although we hold that qualified immunity shielded the officers from a § 1983 action and thus reverse the jury's verdict for plaintiff-appellee Evans on that claim, the fact that a jury actually found that the officers acted with "intentional or reckless disregard" indicates that the evidence could support a finding of mere negli-

gence. If, upon retrial, the jury were to find for the plaintiff on a negligence claim (discussed *infra*, in Part VI), the predicate requirement of a finding of wrongdoing on the part of the District or of the officers might be met, and the wrongful death and survival actions might be resurrected.

Evans' son in her presence or that they had any intention of causing Ms. Evans pain through their actions. Additionally, Judge Dixon properly instructed the jurors on the law applicable to negligent infliction of emotional distress,[11] *see Williams v. Baker,* 572 A.2d 1062 (D.C.1990) (en banc), telling them that, in order to find for Ms. Evans, they had to find that

> she was physically in the zone of danger when Virtus Evans was shot, and that she reasonably feared for her own safety as a result of the conduct on the part of the defendant police officers.
>
> If you find that, through the acts of the defendant, the police officers, Mrs. Evans reasonably feared for her own safety and suffered emotional injury as a result, then you may award damages to Mrs. Evans accordingly.

Although the jury found there was no assault and battery in this case, the jury nonetheless found against Officers Powell and Winer on the emotional distress claim. Viewing the evidence in the light most favorable to plaintiff Evans, the prevailing party, *see Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986), we cannot say that no reasonable jury could have reached a verdict in her favor.

Ms. Evans testified that she had feared for her safety when the officers fired their weapons. She also testified that she had suffered physical and emotional harms as the result of witnessing the killing of her son. Of critical importance, there was additional testimony that a firefighter pushed Ms. Evans to the ground in order to protect her from possible stray bullets.

In sum, especially considering the evidence of the officers' negligent conduct discussed below, a reasonable fact-finder could have found that Officers Powell and Winer negligently inflicted emotional distress on plaintiff Evans while she was in the zone of physical danger. *See Williams,* 572 A.2d at 1064. We therefore do not disturb the jury's verdict for plaintiff Evans on the claim of negligent infliction of emotional distress; we affirm the $50,000 judgment.

## VI. NEGLIGENCE

### A.

Because the trial court granted the defendants' motion for directed verdict on the other negligence claims, we consider negligence in the context of Ms. Evans' cross-appeal, in which she claims that the police officers were negligent in two respects: (1) in their overall approach to Virtus Evans, and (2) in shooting him.[12] While we acknowledge the arguable inconsistency of permitting common law negligence actions against the police on facts such as those we have here, while sustaining the officers' immunity under § 1983, the law is clear in establishing both of the following propositions: negligence alone cannot sustain a § 1983 claim, but qualified immunity from § 1983 does not preclude a suit based on common law negligence.

In reviewing the grant of a motion for directed verdict, we must view the evidence in the light most favorable to the non-moving party, who must be given the benefit of all reasonable inferences to be drawn from the evidence. *See Washington Metro. Area Transit Auth. v. Jones,* 443 A.2d 45, 49 (D.C. 1982); *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979).

Judge Dixon, concerned that "there [was] an effort here to convert what is otherwise an intentional tort matter ... into an issue of negligence," granted defendants' motion for directed verdict on the negligence claims. Although the jury verdict on the assault and battery claim indicates that the officers did not act deliberately when they shot Virtus Evans, this does not preclude plaintiff from claiming that the officers were negligent in shooting Evans. Nor does it preclude litiga-

---

11. In instructing the jury on the emotional distress claim, the judge never actually used the word "negligent," although, as noted, he did instruct on negligent, rather than intentional, infliction of emotional distress law.

12. The District and the officers contend that plaintiff Evans did not argue the theory of negligence to the trial court, namely, that the officers were negligent in their approach to Mr. Evans before the shooting. The record does not support this contention; the issue was presented and thus preserved for appeal.

tion of plaintiff's theory that the officers' conduct was negligent during the period of time leading up to the shooting.

### B.

Turning first to the claim of negligence in the officers' actual shooting of Virtus Evans, we note that this court has twice addressed Judge Dixon's reasoning that plaintiff was improperly attempting to convert an assault claim into a negligence action. In *District of Columbia v. Downs*, 357 A.2d 857 (D.C.1976), an officer shot and killed an unarmed man in the man's apartment. The officer testified that, as he approached a closet during a search, Gary Downs suddenly burst from behind the door and moved quickly toward the officer. The officer, having only a split-second to respond and seeing only that a much larger man was charging him,[13] accordingly shot the man in self-defense. Plaintiff, Downs' mother, alleged that the officer had not shot in self-defense. She claimed that the officer had shot her son while Downs was still inside the closet, then moved Downs' body to the center of the bedroom. There was some evidence of this, as blood was found inside the closet. The jury found that the officer had not committed an assault but also found that the officer had been negligent in shooting Downs. This court, noting the difference between an intentional act (assault) and a negligent one, allowed the verdict to stand.

In *District of Columbia v. White*, 442 A.2d 159 (D.C.1982), we again held that a jury could find negligence in a police shooting case, even though it had found that the officer involved had not committed an assault and battery. In *White*, an officer shot an unarmed man when the officer, after hearing shouts of "drop it," mistakenly believed that the victim had a gun. The District claimed that the shooting could only have been intentional, in self-defense, and thus argued that the shooting could only be characterized as an assault, and not as negligent conduct. The District accordingly maintained that the trial court should have granted the District's motion for judgment notwithstanding the verdict, and thus that the trial court should

have thrown out the jury's negligence verdict for plaintiff. Relying on *Downs*, we held that the court did not err in denying the motion for j.n.o.v. and in submitting the case to the jury on the issue of negligence.

██ Based on *White* and on *Downs*, therefore, the jury's verdict for the defendants on the assault and battery claim in this case did not preclude a possible finding of liability attributable to negligence.

██ Evans stresses, in particular, that D.C. police regulations, 6A DCMR §§ 207.1, 207.2 (1988), established Officer Powell's and Officer Winer's duty to Virtus Evans. She then argues that the officers' violation of these regulations is evidence of their negligence. *See White*, 442 A.2d at 163 (police shooting case where to prove negligence, plaintiff relied in part on evidence of violation of police regulations on use of force).

Judge Dixon read the regulations to the jury as part of his instructions covering the § 1983 claim:

§ 207.1. It is the policy of the Metropolitan Police Department that each member of the department shall, in all cases, use only the minimal amount of force which is consistent with the accomplishment of his or her mission and shall exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms.

§ 207.2. No member of the Metropolitan Police Force shall discharge a firearm in the performance of police duties except under the following circumstances: To defend himself or herself or another from an attack which the officer has reasonable cause to believe could result in death or serious bodily injury.

Plaintiff Evans presented testimony through her expert witness, Paul Rappaport, that the officers had violated 6A DCMR §§ 207.1 and 207.2 when they fired upon Virtus Evans. Rappaport testified that the officers did not "use only the minimal amount of force which is consistent with the accomplishment of his or her mission and ... exhaust every other reasonable means of apprehension or defense

---

**13.** The officer was 5′6″ tall whereas the man from the closet was 6′.

before resorting to the use of firearms." *See* 6A DCMR § 207.1.

Furthermore, three persons testified that Virtus Evans did not have a knife at the time he was shot. Plaintiff thus presented evidence that Officer Powell was never in danger of bodily harm from the victim. More specifically, plaintiff Evans herself testified that her son had never had a second knife and that Officer Powell had not been in any danger of harm from her son. The implication of the testimony that Virtus Evans never had a knife was that the officers were not "[defending themselves] or another from an attack which [they had] reasonable cause to believe could result in death or serious bodily injury." 6A DCMR § 207.2.

All this evidence supports the allegation that the officers were negligent in shooting Virtus Evans. Viewed in the light most favorable to the plaintiff, this evidence created a triable jury issue on the officers' alleged negligence.[14]

## C.

██ Plaintiff Evans also contends that the police officers were negligent in their overall approach to the scene. More specifically, she argues that the officers' conduct in pursuing Virtus Evans outside his home further agitated Evans, who was not in full control of his faculties, rather than calming him down. This is their so-called "tiger in a cage" contention. In closing argument, plaintiff's counsel stressed that the circumstances surrounding the killing of Virtus Evans were analogous to someone entering a cage with a tiger in it. Counsel proffered that "once you are in that cage you might have to kill that tiger.... What we are saying is that [Officer Powell] should not have walked, knowingly, into that cage."

This second argument of negligence was also at least alluded to in the original complaint in Counts V and VI:

37. That the police officers who responded to the scene, Defendants Joyce Powell and Eric Winer, owed a duty to the public, to the Plaintiff and to the deceased to seek qualified assistance or medical aid in dealing with the deceased's medical condition, to use minimum force and violence to subdue the Defendant and to otherwise reasonably treat the deceased according to his medical condition.

38. That the Defendants, Joyce Powell and Eric Winer, breached that duty by failing to seek qualified advice or assistance in dealing with the deceased's condition, by failing to use other available non-lethal means to subdue the deceased, by using excessive force on the deceased and they were otherwise negligent and careless....

42. That Officer Joyce Powell breached that duty by failing to inform Officer Eric Winer and the other officers at the scene of the deceased's mental condition and she was otherwise negligent and careless.

Although this is a less traditional theory of negligence, we see no reason why plaintiff Evans should be precluded from presenting this particular theory to the jury, having supported it with testimonial evidence. Plaintiff's evidence that Officer Powell entered the scene suddenly, with her gun drawn, and that Virtus Evans never posed a serious threat to the officers, coupled with the expert's testimony that Officer Powell had not followed required police procedures in the way she approached the scene, support this theory of "negligent approach." Rappaport testified that proper police procedure required that the officers should have continued to give Virtus Evans the necessary space and time to calm down. There was testimony at trial, however, that, rather than doing this Powell moved in closer to Evans, eventually shooting him. This evidence was strong enough to get the negligence issue before a jury.

---

14. Under plaintiff's theory, there is little question that the officers' conduct was the "but for," or factual cause of Virtus Evans' death. However, whether this conduct was the "proximate," or legal, cause of his death is open to question. Because the trial judge dismissed plaintiff's negligence claims at the end of her case, defendants were never able to present any argument that, for example, Virtus Evans' own behavior was the legal cause of his being shot. This defense, therefore, will theoretically be available on a retrial.

It is only fair to note here that, although all three defendants were represented by the same attorney at trial, they are not in identical litigation postures in this case. Plaintiff Evans presented considerably more damaging testimony of negligence by Officer Powell than of negligence by Officer Winer. In fact, even Mr. Rappaport, the plaintiff's own expert witness, said at least five times that Officer Winer had been following proper police procedures in his actions until the actual shooting. As the following exchange between defendants' attorney and Rappaport illustrates, Rappaport went even further in his near praise of Officer Winer's conduct:

Q: And you stated that Officer W[ ]iner did everything that he was supposed to do under these circumstances; is that correct?

A: Yes, up to the point where the actual shooting took place.

Additionally, plaintiff Evans herself testified that she had not seen Officer Winer until just before the shooting took place. Moreover, Daniel Beach, the firefighter called as plaintiff's witness, testified that Virtus Evans did, in fact, have a second knife, negating somewhat the claim of negligence in Winer's shooting of Evans, which is the stronger of the two negligence theories against Officer Winer.

In contrast, Rappaport repeatedly testified that Officer Powell had not been following police procedures, and plaintiff Evans testified that Officer Powell's gun had been drawn from the moment she arrived at the scene. The evidence, therefore, presented a stronger case for Officer Powell's negligence than for Officer Winer's.

This difference in testimony, however, does not permit a directed verdict rejecting the negligence claims against Officer Winer; plaintiff presented enough evidence for a jury triable issue of fact as to whether Officer Winer had been negligent in shooting Virtus Evans. Specifically, plaintiff's witnesses testified that Officer Powell was not in any danger when both officers discharged their weapons. Further, Rappaport testified that both officers unnecessarily used excessive force when they fired without first exhausting less intrusive means of controlling the situation, in violation of the police regulations, 6A DCMR §§ 207.1, 207.2, quoted above.

## D.

This leaves the question of the District of Columbia's alleged negligence. If the jury, after a new trial, finds that the officers acted negligently, the District can be held liable under the doctrine of *respondeat superior*, for the officers were clearly acting within the scope of the District's employment. *See White*, 442 A.2d at 162 n. 7.

As to the other negligence claims directly against the District—*i.e.*, the claims of failure to train and supervise 911 operators, firefighters, and police officers—the trial court correctly granted defendants' motion for directed verdict. Plaintiff presented no evidence that the District was negligent in any of these areas, and plaintiff's counsel even conceded in the argument against defendants' motion for directed verdict that there was not "any evidence of breach of training on behalf of the police." We therefore affirm Judge Dixon's directed verdict as to these claims against the District, leaving the District potentially liable only under *respondeat superior* if the officers themselves are found liable for negligence at a new trial.

## VII. The Default Judgments

■■■■ Plaintiff Evans also claims on her cross-appeal that Judge Murphy erred in vacating default judgments entered against Officers Powell and Winer. There was no error. Super.Ct.Civ.R. 55(e) provides:

*Judgment against the United States or the District of Columbia.* No judgment by default shall be entered against the United States or the District of Columbia, or an officer or agency of either, unless the claimant establishes a claim or right to relief by evidence satisfactory to the Court.

*Clark v. Moler*, 418 A.2d 1039 (D.C.1980), emphasizes the "judicial policy favoring a trial on the merits." *Id.* at 1043. *Clark* also makes clear that this court shall not set aside the trial court's vacation of a default judg-

ment absent an abuse of discretion. *See id.* at 1041.

Judge Murphy found the necessary good cause under Super.Ct.Civ.R. 55(c) [15] to set aside the default judgments. In addition, both officers requested representation by the Metropolitan Police Department General Counsel within days of being served. Both officers also notified the General Counsel within days of learning of the default judgments. They filed verified answers and motions to vacate the default judgments shortly after that. There was no discernible prejudice to the plaintiff from time delays, especially because Judge Murphy found plaintiff Evans herself was responsible for many other pretrial delays.

### VIII. CONCLUSION AND DISPOSITION

In sum, we conclude that Officers Powell and Winer are immune from the § 1983 claim and the District, therefore, is also not subject to § 1983 liability (Count X of plaintiff Evans' original complaint). We reverse the judgments on the § 1983 claim and on the related survival claim totalling $500,000. We also must reverse the $62,828 judgment on the wrongful death claim (Count VIII) as to all defendants, as it, too, is predicated on the § 1983 action. We affirm, however, the $50,000 judgment for plaintiff Evans on the "infliction of emotional distress" claim (Count IX)—understood to be a negligence claim—against all defendants, which stands on its own merits apart from the § 1983 action.

We also conclude that the trial court erred in dismissing plaintiff's negligence claims, namely the claims that the officers (1) negligently handled the overall situation, and (2) negligently used excessive force in violation of police regulations (parts of Count IV and Counts V and VI). Because the District defendants have not argued that, as a matter

of law, such negligence could not have been the cause of Virtus Evans' death, we must reverse and remand for a new trial on those issues alone. If the plaintiff prevails against the police officers on a negligence theory, the District may also be subject to liability for negligence under the doctrine of *respondeat superior.* Finally, the trial court correctly directed verdicts for the defendants on the other claims of negligence against the District, *i.e.,* those concerning alleged failures to train various personnel properly (Counts I, II, and part of Count IV).[16]

*So ordered.*

---

**15.** Super.Ct.Civ.R. 55(c) provides:

*Setting aside default.* For good cause shown, and upon the filing of a verified answer setting up a defense sufficient if proved to bar the claim in whole or in part, the Court may set aside an entry of default. No answer need be filed if the movant accompanies the motion with a settlement agreement or a proposed consent judgment signed by both parties. In addition, an answer shall not be required when the movant asserts a lack of subject-matter or

personal jurisdiction or when the default was entered after the movant had filed an answer.

**16.** Because no evidence was presented as to Count III, alleging negligence in the failure of firefighters to get medical assistance for Virtus Evans at the beginning of the incident, the trial court did not err in directing a verdict for all defendants. Count VII, the assault and battery claim on which the jury found for the District defendants, is not a subject of this appeal.