Jason LISER, Plaintiff,

v.

Jeffrey SMITH, et al., Defendants.

No. CIV.A.00–2325 (ESH).

United States District Court, District of Columbia.

March 26, 2003.

Steven R. Kiersh, Washington, DC, Billy L. Ponds, Ponds Law Firm, Washington, DC, for Jason Liser.

John J. Grimaldi, II, Wayne C. Beyer, Office of Corp. Counsel, D.C., Washington, DC, for Jeffrey Smith.

John J. Grimaldi, II, Wayne C. Beyer, David A. Hyden, Office of Corp. Counsel, D.D., Washington, DC, for Dist. of Columbia.

Kimberly L. Limbrick, Anne Toomey McKenna, Crosswhite, McKenna, Limbrick & Sinclair, LLP, Baltimore, MD, for Bank of America, N.A.

## MEMORANDUM OPINION

HUVELLE, District Judge.

On August 12, 2000, plaintiff Jason Liser was arrested for the murder of Vidalina Semino Door after being identified as the man withdrawing money from a Bank of America ATM in a video surveillance photo taken on the night of the murder. The police knew that the victim's ATM card had been used at that same machine shortly after her death, and had released the still picture to the public because its subject matched a eyewitness's description of one of the suspects who had been seen fleeing from the scene of the crime. Less than a week after his arrest, however, plaintiff was released when it became apparent that the time indicated by the bank's camera was significantly inaccurate, and therefore that plaintiff had actually used the ATM before the murder even took place. Ultimately, two other men were arrested and convicted for the killing.

Plaintiff has now brought this action against the District of Columbia and the individual police detective, Jeffrey Smith, responsible for the investigation and mistaken arrest.[1] He has asserted the following claims: false arrest and imprisonment (Count I); libel and slander (Count II); negligence (Counts III and IV); violation of 42 U.S.C. § 1983 by Detective Smith for allegedly providing false information to support plaintiff's arrest (Count V); and intentional infliction of emotional distress (Count VI). Defendants have now moved for summary judgment on all of these counts. For the reasons that follow, the Court grants this motion as to all counts save those alleging negligence, as to which the motion is denied.

**BACKGROUND**

The facts of this case are largely not in dispute. Vidalina Semino Door left work at the Omni Shoreham Hotel in Northwest Washington, D.C. at approximately 11 p.m. on May 5, 2000. A few hours later, Sgt. José Bimbo of the Metropolitan Police Department heard gunshots and saw four black men running from the area of 22nd Street and T Place, SE, toward Good Hope Road. Soon after, at 1:27 a.m., other MPD officers arrived at the area in response to a telephone call reporting the shots. Sgt. Bimbo and the other officers found Ms. Semino's body in a nearby wooded area; she had suffered multiple gunshot wounds, including two to the upper chest that killed her, and was pronounced dead on the scene. Two homicide detectives, Monica Shields and defendant Jeffery Smith, were called in on the case; by rotation, Smith assumed the role of lead detective in the investigation.

Assistant United States Attorney ("AUSA") James Sweeney was also assigned to the case. On Monday, May 8, he called Detective Smith to inform him that bank records had revealed that Ms. Seminio's ATM card had been used to withdraw $200 from a Bank of America Branch in Anacostia some 20 minutes after her murder. The branch in question is located on Martin Luther King Avenue, less than a mile from where her body was discovered. According to the records, the withdrawal occurred at 1:47 a.m. on May 6; the records also showed that another $81 had been taken out of a 7–11 ATM on Oxon Hill, Maryland at 2:17 a.m. Sweeney asked the detectives to retrieve the surveillance tape from the Bank of America branch, which they did on May 11. (As it turned out, the 7–11 ATM did not have a working video camera.)

Reviewing the videotape, the detectives and AUSA Sweeney discovered that there was no ATM activity recorded at 1:47 a.m. According to the time indicated on the tape, the nearest transaction occurred at 1:52 a.m., when a black male wearing a white t-shirt can be seen standing before the machine. (Ex. 5.) This individual was later identified as Jason Liser. At some point early in the investigation, the bank's branch manager told Detective Smith that there could be a discrepancy of up to fifteen minutes between the time indicated on the surveillance tape and the actual time. (Ex. 12 [Smith Dep.] at 71.) Considering this information of potential importance to the investigation, Detective Smith passed it along to AUSA Sweeney. (*Id.* at 73–74.) Based on this understanding of the time gap, the investigators centered on Liser as their prime suspect,

---

1. By Order dated November 13, 2002, the Court dismissed all of plaintiff's claims against Bank of America, which he had sued for negligence and infliction of emotional dis- tress based on the inaccuracy in the timing mechanism of the bank's video surveillance equipment.

being the only young black male to use the ATM during that timeframe. (*Id.* at 193.)[2]

However, no arrest was made at that time. Instead, the investigation continued, but turned up no further clues and no other suspects. In August 2000, AUSA Sweeney and his supervisor, AUSA Albert Herring, decided to appeal to the public for help in their investigation. Together with Detective Smith, they prepared a press release titled "Suspect(s) Sought in 22nd & T Place, SE, Homicide," which included the following statement:

> Minutes after the murder an unidentified black male utilized Ms. Semino's bank card at an ATM at the Bank of America located in the 2100 block of Martin Luther King Avenue, S.E. A photograph of the subject was taken by the bank camera.

(Ex. 6.) At his deposition, Detective Smith described his role in crafting this press release as "minimal" and suggested that it was the AUSAs' decision to release the picture along with the statement. (Ex. 12 [Smith Dep.] at 196–97.) The release was sent out along with the photograph of plaintiff to a variety of media outlets on August 9. Both the *Washington Post* and *Washington Times* published stories based on this information, and the *Times* printed Liser's picture in its August 10 edition. (Ex. 7.)

This publicity soon bore fruit. Recognizing her nephew in the photograph, Liser's aunt contacted Sweeney a day or two after the news stories ran. She then came to his office for an interview, in which she told the investigators that plaintiff had told her that he was not involved in the murder, but that she did not believe him "because he didn't sound right over the phone" and "was always into something." (Ex. 12 [Smith Dep.] at 199–200.) Based on the identification of Liser as the man on the surveillance tape and the information provided by his aunt, Detective Smith, along with Sweeney and Herring, decided that they now had probable cause to arrest plaintiff. Accordingly, Smith began drafting an affidavit in support of an arrest warrant. (*Id.* at 115–18.) No further investigation was conducted. (*Id.*)

On August 12, Liser turned himself in to the MPD's Sixth District, where he was formally arrested. (Ex. 9 [Arrest Report].) He told the police that on the night of the murder he had used his girlfriend's ATM card to withdraw $40, which is how he came to be recorded on the bank camera. On August 14, Liser was brought before a Hearing Commissioner who ordered him held without bond on a charge of first-degree murder. In support of this detention, Detective Smith prepared an affidavit, which summarized the government's case against Liser and included the following passage: "The bank's security camera at the teller machine photographed a black male subject, later identified as the defendant, JASON LISER, using the ATM card and PIN number to retrieve $200.00 from the decedent's checking account." (Ex. 10.) This information was therefore the key piece of evidence leading to both Liser's arrest and his continued detention.

---

**2.** This conclusion, however, seems at odds with the surveillance video itself. Pictures culled from the videotape show black males other than Liser using the ATM at "1:56 a.m." and "2:05 a.m.," as well as a black female using the machine at "2:04 a.m." (Ex. 5.) While the copies of these pictures that have been provided to the Court are grainy and rather poorly photocopied, both of the men in question appear, like plaintiff, to have been wearing white t-shirts and to be relatively young. Information from a witness suggested that one of the men seen fleeing from the area of the crime scene in a car later identified as that of the murder victim was wearing a white t-shirt. (Ex. 3.)

While plaintiff remained in custody following his arrest, this crucial aspect of the case against him began to unravel. The investigators decided to do an experiment at the Anacostia branch in which Sweeney withdrew money from the ATM and compared the time on his receipt to the time on the corresponding surveillance tapes. (Ex. 13 [Shields Dep.] at 35–36.) The results of their experiment led Sweeney, along with Detectives Smith and Shields, to conclude that the discrepancy was actually greater than the fifteen-minute gap they had previously estimated. (Ex. 12 [Smith Dep.] at 202–03.) Based on this new information, the investigators, in consultation with another AUSA, Dan Friedman, decided that plaintiff should be released, which he was on August 18. (*Id.* at 207–08.) Eventually, information about activity on Semino's credit card several days after her death led to the arrest and conviction of her killers. There is thus now no dispute that plaintiff was not involved in the murder and that he did not use Semino's ATM card on the night she was killed or at any other time.

## ANALYSIS

### I. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine, and should preclude summary judgment, if a reasonable jury could return a verdict in favor of the non-moving party. *Id.* In contrast, the moving party is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia,* 298 F.3d 989, 992 (D.C.Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Washington Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir. 1989). However, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue of material fact for trial. *See* FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Therefore, the court "must assume the truth of all statements proffered by the party opposing summary judgment," except for wholly conclusory statements unsupported by any competent evidence. *Greene v. Dalton,* 164 F.3d 671, 674–75 (D.C.Cir.1999); *Dickerson v. SecTek, Inc.,* 238 F.Supp.2d 66, 73 (D.D.C. 2002).

### II. Count I: False Arrest and Imprisonment

 A false arrest or imprisonment claim turns first on whether the plaintiff was unlawfully detained. If the arrest was legally justified—for example, if supported by probable cause or a valid warrant—the conduct of the arresting officer is privileged and a claim will not lie. *Tillman v. Washington Metro. Area Transit Auth.,*

96

695 A.2d 94, 96 (D.C.1997); *Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C.Cir.1996) However, even if an objectively unlawful arrest occurs, an officer may justify that arrest and defeat plaintiff's action by recourse to a subjective test, *i.e.* that the officer had a reasonable good faith belief that his or her conduct was lawful. *See Weishapl v. Sowers*, 771 A.2d 1014, 1020–21 (D.C.2001); *Taylor v. District of Columbia*, 691 A.2d 121, 125–26 (D.C.1997). In making this inquiry, good faith is to be evaluated from the perspective of the arresting officer, rather than that of the plaintiff. *See District of Columbia v. Murphy*, 631 A.2d 34, 36–37 (D.C.1993).

 The Court must first address whether defendants had probable cause to arrest plaintiff. This is ordinarily a mixed question of law and fact; however, where the facts are not in dispute, the issue becomes a purely legal one which the Court can answer on its own. *See Moorehead v. District of Columbia*, 747 A.2d 138, 147 (D.C.2000); *Welch v. District of Columbia*, 578 A.2d 175, 175 (D.C.1990). The existence of probable cause is based on an objective test: whether a reasonably prudent police officer, considering the totality of the circumstances confronting him, would be warranted in believing that the individual in question committed the offense. *Davis v. United States*, 781 A.2d 729, 734 (D.C.2001). Here, there is no dispute between the parties that the circumstances as understood by Detective Smith at the time of plaintiff's arrest were as follows: (1) the victim's ATM card had been used at 1:47 a.m. by someone implicated in her murder; (2) the time encoded on the ATM surveillance tape was off by up to fifteen minutes; (3) the tape showed plaintiff using the ATM card at a time that could have been 1:47 a.m. if the video's timer was in fact off by up to fifteen

minutes; (4) as he appeared on the surveillance video, plaintiff matched a witness's description of one of the murder suspects in that he was a young black male wearing a white t-shirt; (5) plaintiff's aunt had identified plaintiff on the tape and told the police that she did not believe his denial of culpability.

There can be little serious question that this information, if accurate, would suffice to establish probable cause for plaintiff's arrest. Plaintiff does not suggest otherwise. The more difficult problem presented by this case is that "fact" (2) is not accurate. The assumption of a fifteen-minute gap was wrong, and indeed was proven wrong by the investigating officers themselves soon after the arrest was made. These circumstances present the Court with the following legal question: is there probable cause to support an arrest where the critical factual assumption on which the probable cause determination has been based is simply wrong? In answering this question, it is important to realize that not every mistaken arrest is an unlawful arrest. Sometimes the facts used to justify an arrest turn out to be mistaken, but this does not mean that the arrest itself was necessarily illegal *ab initio*. Accordingly, the effect of a mistake of fact must be based on the same sort of objective test used to determine the existence of probable cause in the first place. *See Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."); *cf. Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some

mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

Thus, in the cases of *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), and *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the Supreme Court held that "objectively understandable and reasonable" mistakes made by law enforcement officers in the course of executing arrest or search warrants do not render the resulting arrests or searches unlawful. In *Hill*, police armed with a warrant to arrest a man named Miller mistakenly arrested Hill, whom they reasonably believed was Miller. The Court held that the search incident to the arrest of Hill was legal. 401 U.S. at 803–05, 91 S.Ct. 1106. In *Garrison*, the police had a warrant to search "the premises known as 2036 Park Avenue third floor apartment." They believed that there was only one apartment on the third floor; in fact there were two, which they did not discover until they were already inside the second apartment, where they found contraband. Finding this mistake to have been reasonable, the Court held that this evidence was not the fruit of an unlawful search. 480 U.S. at 87–89, 107 S.Ct. 1013.

▉ To be sure, the present case is different from *Hill* and *Garrison;* there, probable cause undoubtedly existed as to one man (or one place), but another was mistakenly arrested (or searched) instead. Here, in contrast, the police got the man they were looking for, but they made a mistake that, if discovered, would have left them without probable cause to arrest that person. The mistakes made in *Hill* and *Garrison* thus go to the *application* of probable cause, while the mistake in this case goes to the *formation* of probable cause. This distinction, however, should make no difference in determining what standard should be used to evaluate whether a mistake of fact voids the legality of an arrest. Either way, an individual is arrested under circumstances that, had the true facts been known, would not have allowed for that arrest. Nevertheless, while an objectively reasonable mistake of fact can legally support a determination of probable cause, a mistake that is the product of the government's willful ignorance, investigative negligence, or is otherwise unreasonable, cannot. *See United States v. Gonzalez*, 969 F.2d 999, 1005–06 (11th Cir.1992) ("A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in light of all the circumstances."); *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994); *Kies v. City of Aurora*, 156 F.Supp.2d 970, 981–82 (N.D.Ill.2001) ("[A]s long as the officer's belief is reasonable, it need not be correct; reasonable mistakes will be excused.").

The Court's task, therefore, is to determine whether the mistake here was an understandable one, that is, whether it was reasonable, at the time of the arrest, for Detective Smith to have relied on the truth of the incorrect assumption about the time discrepancy on the surveillance tape. This inquiry requires consideration of both the source of the false information and whether it was the sort of information that, under the circumstances, should have prompted further investigation to assess its veracity. *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued ...."); *Jenkins v. City of New York*, 1992 WL 147647, at * 4–5 (S.D.N.Y. June 15, 1992)

("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause."). In other words, probable cause can be said to support plaintiff's arrest if any prudent officer in Detective Smith's position would have relied on the information that the tape was off by up to fifteen minutes and would have seen no need for further investigation to determine whether this information was accurate.

While this issue is a close one, the Court is not ready to conclude that it was objectively reasonable under the circumstances of this investigation for the police to rely solely on the bank's representations about the time discrepancy without attempting to verify that information by empirical (or other) means. The crucial point here is that this was not a fast moving investigation in which the officers were called upon to make snap judgments based on limited information. Far from it. Detective Smith had the surveillance tapes within a week after the murder; at that early date he had been told by the branch manager that the time on the tape could be off by up to fifteen minutes. (Ex. 12 [Smith Dep.] at 71–72.) Plaintiff was not, however, arrested until August, three months later. During this lengthy interval, neither Detective Smith nor anyone on his team made any further attempt to verify the estimation about the length of the gap. They had no further contact with anyone at Bank of America, especially its security personnel, who might have had more accurate information about the camera's timer. (*Id.* at 59–60.) They did not inspect the camera itself. Nor did they attempt use

the ATM themselves to compare real time against tape time.

In short, despite the fact that the tape was their central lead as to the identity of the murderer, the investigators did nothing to pin down exactly how far off the video clock was, at least not before plaintiff was arrested.[3] Instead, Detective Smith and his team chose to rely solely on a single, untested statement from the bank manager. Such reliance might well have been unassailable had the investigators been making an on-the-spot determination as to whether probable cause existed to arrest plaintiff in the first frantic days after the murder. But in the circumstances of the deliberate, slowly unfolding investigation that ensued, during which the officers should have had ample time to pursue leads and to check facts, their failure to verify the length of the gap on the video stands in a rather different light. Their conduct appears more sloppy than reasoned, the product of carelessness rather than craft. The Court is thus unable to say with certainty that this crucial mistake was ultimately a permissible one, or that prudent investigators would necessarily have conducted themselves as defendants did here.

■ This uncertainty as to the reasonableness of relying on the bank manager's statement does not, however, end the inquiry. As noted above, a false arrest claim can be defeated even where an arrest was not actually supported by probable cause, if the defendant officers had merely a reasonable, good faith belief that probable cause existed. The Court believes that even when the evidence is con-

---

3. The fact that the police finally sought to verify the information—and quickly and readily learned that it was inaccurate—*after* Liser's arrest certainly does not help their cause. That such an simple test was not done in the three months preceding the arrest, and

if done would have cast serious doubt on the propriety of that arrest, suggests an investigative sloppiness that at least casts doubt on whether the initial arrest was actually supported by probable cause.

strued in plaintiff's favor, no reasonable jury could conclude that Detective Smith lacked such a belief in the legality of Liser's arrest. *Cf. Glenn v. Washington Metro. Transit Auth.,* 1987 WL 8530, at *2 (D.D.C. March 6, 1987). Most importantly, there is not a shred of evidence to suggest that at the time of the arrest Detective Smith (or anyone else involved in the investigation) knew that the time discrepancy was greater than the fifteen minutes suggested by the bank. While they certainly could (and perhaps should) have more thoroughly investigated the actual discrepancy before arresting Liser, their failure to do so is in no way indicative of subjective bad faith.

It might be otherwise had there been an indication of a longer gap, or if there was some tangible reason for the investigators to disbelieve the bank's representation. On the record before the Court, there was not. As such, there is simply no evidence that their reliance on that information was anything other than a mistake—perhaps a negligent mistake—but certainly not a willful or even a reckless one. And an arrest prompted by such an honest mistake, even one that a more prudent officer might have avoided, is just the event that the good faith rule is designed to forestall from generating civil liability for false arrest. In sum, no jury could rationally conclude from this record that Detective Smith did not in fact believe that he had probable cause to arrest plaintiff.

Moreover, it is significant to note that Detective Smith was actually not the final decisionmaker with the power to approve the arrest warrant. Instead, this was the responsibility of AUSA Herring, who decided—along with AUSA Sweeney—that probable cause existed on the strength of the surveillance tape along with the identification and statement made by Liser's aunt after the press release had been is-sued. (Ex. 12 [Smith Dep.] at 114, 116, 118.) These AUSAs are not defendants here, and the District of Columbia is not responsible for their actions. The fact that those making the ultimate decision believed Liser's arrest to be legally justified makes it far more likely that Smith subjectively shared that belief. His subordinate position in the chain of command—especially the fact that he seems to have been largely *implementing* a probable cause decision that had actually been made by others—thus reinforces Smith's claim that he had a reasonable good faith belief in the existence of probable cause.

Similarly, there is nothing to suggest that this good faith belief was held irrationally. After all, the branch manager was not an unreliable source of information on the performance of the surveillance camera, but rather was certainly in a position to know both that there was a gap and how long it might be. While the failure to independently verify or corroborate this information may not have been objectively reasonable, that certainly does not mean that it was unreasonable to hold a subjective belief that the information was accurate. As such, even if his ultimate judgment that probable cause existed was misguided, Detective Smith's belief that such probable cause supported plaintiff's arrest was entirely understandable, and under the circumstances presented here serves to immunize him from liability for false arrest.

Nor does the fact that Detective Smith submitted an affidavit containing what in hindsight was an incorrect factual statement—that the man in the surveillance photo (Liser) had used Semino's ATM card and PIN number—defeat this conclusion. Instead, that misstatement is the obvious consequence of defendant's mistaken belief that the time on the tape was approximately five minutes ahead of real time. Oper-

ating on that assumption, it is entirely reasonable to assume that the picture of plaintiff withdrawing money from the ATM at "1:52" in fact depicted plaintiff withdrawing money at 1:47, and therefore that he had used the victim's card and access number to do so. Without any evidence that Smith possessed information to the contrary, his mistake cannot be said to be the product of bad faith; without any evidence that the source of his information was untrustworthy, his good faith mistake cannot be said to be unreasonable. For these reasons, the Court grants defendants' motion for summary judgment as to this count.

### III. Count II: Libel and Slander

■ Plaintiff alleges that the press release and accompanying photograph were designed to injure him by falsely identifying him in the eyes of the public as a murderer. (2d Am.Compl.¶¶ 36–38.) Under D.C. law, government officials have absolute immunity in actions for libel and slander—even if their statements *are* false and defamatory—provided that two conditions apply. First, the official must have acted within the "outer perimeter" of his official duties; second, the particular government function at issue must have been "discretionary" as opposed to "ministerial." *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C.1990). This approach is followed regardless of the rank of the official who has been sued; what matters is not title, but function. *Id.* at 1020 n. 16.

The first issue is more straightforward. The act giving rise to the suit must be situated in relation to the official's proper functions and duties. If the act is of the sort committed by law to his or her official responsibilities, or is even related to those responsibilities, it falls within the protected perimeter. *Id.* (quoting *Cooper v. O'Connor*, 99 F.2d 135, 139 (D.C.Cir.

1938)). This test is easily met in the present case. Seeking the help of the public in solving a pending murder investigation by releasing information about a leading suspect falls squarely within the official duties of a police detective. The investigation of the Semino killing had stalled; the surveillance image represented MPD's primary lead. Because the investigators did not know the identity of the man in that picture, issuing a press release under these circumstances was sound police work. Indeed, it is plausible to think that the detectives would have been remiss had they *not* done so. As such, there can be no doubt that taking this sensible and entirely routine step was within the scope of duty of those District officials responsible for doing so.

■ Determining whether that act was "discretionary" as that term is understood in this context is a more difficult task. In general terms, immunity is to be granted where necessary to assure "fearless, vigorous, and effective decisionmaking." *Id.* at 1020. This requires the Court to balance the governmental interests at stake against the private injury alleged, and thereby to evaluate whether it is appropriate to preclude the compensation of that injury in order to protect important government functions against the disruptive and timidity-inducing threat of civil litigation. *See District of Columbia v. Simpkins*, 720 A.2d 894, 898 (D.C.1998). This balancing test involves four factors, though this list is not necessarily exhaustive: (1) the nature of the plaintiff's injury; (2) the availability of alternative remedies; (3) the ability of the court to determine fault without unduly invading the executive function; and (4) the importance of protecting particular kinds of acts. *Id.; see also Kendrick v. Fox Television*, 659 A.2d 814, 820

(D.C.1995).[4]

■ Applying these factors to the present case the Court must conclude that defendants' allegedly defamatory statements are shielded by absolute immunity. First, while plaintiff's reputation may have been injured, he has not alleged or adduced any evidence to suggest that he has suffered any economic or physical damages as a result of the press release. The apparently limited nature of the injury thus cuts somewhat in defendants' favor. *See Kendrick,* 659 A.2d at 820. The second factor, however, works to plaintiff's advantage; the District concedes that Liser has no alternative remedy for his injury. (Defs.' Mot. to Dismiss or, in the Alternative, for Summary Judgment at 19.) However, these factors are significantly outweighed by the next two, which require the Court to examine the government's interest in being exempted from the burdens of litigation.

With respect to the third factor, allowing courts to engage in post hoc evaluation of decisions made by law enforcement officers to release information about pending investigations would invite the kind of invasion of a core executive function that immunity is designed to block. So held the D.C. Court of Appeals in *Kendrick,* which controls the present case. "If courts were to have responsibility for deciding whether the statements of police officials about ongoing investigations are false and defamatory, they would be second-guessing details of judgments police officials have to make in conducting sensitive and difficult investigations while those officials also are attempting to keep the public adequately informed." *Id.*

For similar reasons, *Kendrick* found that the fourth factor also strongly favored the government, and required the application of absolute immunity in a similar defamation action arising out of the public release of information about an ongoing police investigation. The disclosure of such information is important because it implicates both the public safety and the public's right to know. If the specter of civil litigation hangs upon every press release, law enforcement would likely become far more cautious about enlisting the public's help in solving crimes and in keeping the public aware of the progress of pending investigations. The deleterious consequences of such timidity are obvious. The balance struck in *Kendrick* thus must be the balance struck here: defendants' communications with the public about the hunt for Vidalina Semino's killer, and plaintiff's suspected role in that crime, represent discretionary actions to which liability for defamation cannot attach. Count II is therefore dismissed.

### IV. Count III & IV: Negligence

Plaintiff's common law negligence claims concern two actions taken by defendants: first, the decision to issue the press release and, second, the arrest that followed. He alleges that defendants failed to exercise ordinary care in ensuring the accuracy of the information released to the public and then used to justify his arrest and continued detention. That is, plaintiff contends that Detective Smith and his fellow investigators breached their duty of care by failing to independently verify that Liser (the man in the surveillance photo) could in fact have been the same man who used Semino's ATM card on the night of her murder.

4. Conducting this balancing is a legal issue for the Court. Therefore, whether plaintiff's defamation claim is barred by absolute immunity is appropriately resolved at the summary judgment stage, and should not (as plaintiff contends) be left to the jury. *See Moss,* 580 A.2d at 1020 n. 18.

 "The plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984)). The applicable standard of care in this sort of case, which involves the exercise of professional judgment, is a national one that must be established by expert testimony. *See Etheredge v. District of Columbia*, 635 A.2d 908, 917 (D.C.1993); *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C.1997); *cf. Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 951–52 (D.C.2003) (suggesting that expert testimony is required where the subject to either too technical for lay jurors or implicates the exercise of "sophisticated professional judgment").

 Defendants make two arguments in favor of summary judgment on the negligence counts. First, they assert that the "public duty" doctrine bars recovery. (Defs.' Mem. at 20–25.) This contention can be quickly rejected. Under the public duty doctrine, the District of Columbia and its agents "owe no duty to provide public services to particular citizens as individuals. Instead absent some 'special relationship' between the government and the individual, the District's duty is to provide public services to the public at large." *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C.1990); *see also Powell v. District of Columbia*, 602 A.2d 1123, 1125 (D.C.1992). However, while defendants expound upon this rule at considerable length, they seem to have entirely missed its point.

The public duty doctrine "deals with the question whether public officials have a duty to protect individual members of the general public against harm from third parties or other independent sources." *District of Columbia v. Evans*, 644 A.2d 1008, 1017 n. 8 (D.C.1994); *see also Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C.2001) (doctrine applies in situations where individuals seek to hold the District liable for negligence "because of a failure to protect a person"); *Morgan v. District of Columbia*, 468 A.2d 1306, 1310–12 (D.C.1983) (en banc) (holding that the public duty doctrine generally prevents governments from being held liable for "failure to protect individual citizens from harm caused by criminal conduct"). As such, it is wholly inapposite in a case such as this, where the alleged harm was brought about directly by the officers themselves, and where there is no allegation of a failure to protect. *Evans*, 644 A.2d at 1017 n. 8 (holding that the doctrine has "no relevance" in a police shooting case in which plaintiff was injured directly by police officers). The claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitur where the government itself is solely responsible for that injury, which it has caused by the allegedly negligent use of its own police powers.

 The District's second argument, which presents a much closer question, is that plaintiff has failed to establish a national standard of care. Where expert testimony is required, the expert must identify a "concrete standard upon which a finding of negligence could be based." *District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C.1990). The expert must clearly articulate what the standard is and how it was violated by defendants, which is to be done by comparing "specific standards with specific facts or conduct." *Id.; see also Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C.Cir.2001) ("The expert must refer to commonly used police procedures, identifying specific standards

by which the jury could measure the defendant's actions."); *District of Columbia v. Moreno*, 647 A.2d 396, 400–01 (D.C. 1994) (rejecting expert testimony that "briefly referred to standards without eliciting what the standards are or what they require"). "Thus the expert must clearly relate the standard of care to the practices in fact followed by other comparable governmental facilities or to some standard nationally recognized by such units. If the expert fails to do so, a directed verdict for the defendant is properly granted." *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C.1997). Neither personal opinions nor unsupported generalizations provide a permissible basis for the expert's articulation of the applicable standard of care. *See Travers v. District of Columbia*, 672 A.2d 566, 569 (D.C.1996); *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C.1995).

Here, plaintiffs' proposed expert is James Bradley. Bradley has testified as an expert on police procedures in a several previous cases, including *Butera* cited above. In his preliminary expert report and at his deposition, Bradley identified specific MPD General Orders, circulars, and special order, the protocols taught at the MPD Criminal Investigations School, nationally accepted teaching materials and manuals, including those promulgated by the Department of Justice, as describing the national standard of care with respect to homicide investigations and the use of the press releases therein. He asserted that the investigators here ran afoul of the standard of care delineated in these documents and opined that had they not done so, Liser would not have been arrested for a crime he did not commit. (Pls.' Opp., Exs. 1, 2.) Specifically, with respect to the surveillance camera evidence at the center of this investigation, and the present litigation, Bradley maintained that in keeping with established procedure, Detective Smith should have "ascertained exactly how the bank surveillance cameras operate, sought out assistance from members of the MPD electronic surveillance unit or members of The Federal Bureau of Investigation Bank Squad that are experienced in viewing and interpreting time lines on bank surveillance equipment." Had he done so, "he would have known, or should have known, that the video sequence of the surveillance has to be 'real time' aligned with the time sequence to establish what frame of film correspondence [sic] with the time on the film." (Pls.' Opp., Ex. 1, ¶ 2.)

While defendants are correct that these statements appear not to provide enough specificity as to a concrete standard of care, it must be remembered that Bradley has not yet *testified*. Indeed, every single one of the cases cited by the government in its motion papers, and referenced by the Court above, deal with situations in which the adequacy of the expert testimony was being considered either after trial or after the plaintiff's case-in-chief, typically in the form of a motion by the defendant for directed verdict of for judgment notwithstanding the verdict. *Accord Phillips v. District of Columbia*, 714 A.2d 768 (D.C. 1998) (direct verdict); *Toy*, 549 A.2d at 1 (judgment notwithstanding the verdict). The situation facing the Court now, with a case at the summary stage and the proposed expert having merely submitted a preliminary report and been deposed by the defendant, is therefore distinguishable. Moreover, this is not a situation where the expert's reports and deposition testimony are completely devoid of any reference to concrete and specific standards or practices.

█ Applying the normal analysis appropriate upon motion for summary judgment, the Court concludes that Bradley has put forward a colorable basis to believe that his testimony may satisfy the

standards described above. To be sure, if that testimony merely echoes the somewhat vague assertions advanced in his report and at his deposition, a motion for directed verdict could well succeed. However, the Court is unable to conclude, based on the record before it, that plaintiffs cannot sustain its burden of articulating a specific national standard of care regarding the thoroughness of homicide investigations, particularly those involving evidence culled from surveillance cameras, and describing precisely how that standard was breached by defendants here. For these reasons, the Court will deny defendants' motion for summary judgment on the negligence counts.

## V. Count V: Section 1983

■ Plaintiff argues that Detective Smith violated his Fourth Amendment rights to be free from unreasonable seizure by providing false information to justify his arrest and continued detention. Because this violation was committed under color of state law, plaintiff contends that Detective Smith ran afoul of § 1983 and is therefore liable for damages. It is of course well-settled that the Fourth Amendment is violated when a suspect is arrested in the absence of probable cause. See Gerstein v. Pugh, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Martin v. Malhoyt, 830 F.2d 237, 262 (D.C.Cir.1987). And the above analysis suggests that in

light of defendant's possibly negligent failure to verify the crucial information provided by the bank regarding the camera's timer, the arrest here may not have been supported by probable cause.[5] Even if such a violation occurred here, however, it does not follow that defendant can be liable for damages under § 1983.

■ The doctrine of qualified immunity gives state and local law enforcement officers breathing space to vigorously carry out their duties by protecting them from federal lawsuits even in some circumstances when they in fact impinge on individuals' constitutional rights. Thus, police officers are shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); see also Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law"). In contrast to the subjective "good faith" standard that governs false arrest claims under D.C. law (discussed above), the federal qualified immunity standard is an objective one; the officer's own views about whether his or her conduct violated the law are generally not relevant. See Harlow v. Fitzgerald, 457

---

**5.** It is equally obvious that Detective Smith would have violated Liser's constitutional rights had he, as plaintiff alleges, deliberately falsified evidence in order to justify the arrest and continued detention. However, plaintiff has not made a sufficient factual showing to survive summary judgment on this theory. Where an officer's motive or mental state is relevant to the issue of whether he or she has committed a constitutional violation, the plaintiff must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the

pertinent motive." Crawford–El v. Britton, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). As described elsewhere in this Memorandum Opinion, no such evidence exists in this case. The fact that the affidavit submitted prepared by Detective Smith for the detention hearing contains a material misstatement does not, on its own, permit the reasonable conclusion that defendant intentionally lied in that document. And because plaintiff relies on nothing more than this bare fact, there is no basis for submitting this allegation to a jury.

U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■■■■■ Instead, the focus here is the "objective reasonableness" of the defendant's actions, *Malley,* 475 U.S. at 344, 106 S.Ct. 1092, which in this context means whether the officer had an objectively reasonable basis for concluding that the "facts and circumstances surrounding the arrest were sufficient to establish probable cause." *Wardlaw v. Pickett,* 1 F.3d 1297, 1304 (D.C.Cir.1993). Qualified immunity should therefore be granted if a reasonable officer in defendant's position "could have believed that probable cause existed to arrest" plaintiff. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). If it would have been possible for officers of reasonable competence to have disagreed about whether the arrest was justified, the arrest is immunized. *See Coons v. Casabella,* 284 F.3d 437, 440–41 (2d Cir.2002); *Gibson v. Rich,* 44 F.3d 274, 277 (5th Cir.1995). Thus, an officer who reasonably, but mistakenly, concludes that probable cause is present cannot be held liable under § 1983 for making the arrest. *Bryant,* 502 U.S. at 227, 112 S.Ct. 534. This is generally a question for the Court, not for the jury, and in light of the purposes of qualified immunity, should be resolved as early in the proceedings as possible. *See Saucier,* 533 U.S. at 200–01, 121 S.Ct. 2151; *Bryant,* 502 U.S. at 228, 112 S.Ct. 534 ("Immunity ordinarily should be decided by the court long before trial.")

■■■ In the present case, the Court concludes that Detective Smith's conduct

relating to plaintiff's arrest and continued detention are protected by qualified immunity. There can be little doubt that a reasonable officer *could have believed* that probable cause supported the initial arrest. As recounted above, at the time that Liser turned himself in, the investigators had information that he was the man who had been recorded using the Bank of America ATM at roughly the time that it was known that the murder victim's stolen card had been used at that machine. Plaintiff also matched the description of one of the suspects who had been seen fleeing the scene of the crime. Under these circumstances, it was not manifestly unreasonable to conclude that this information justified an arrest. Moreover, without some objective reason for the investigators to have been skeptical of the bank's information about the time discrepancy, or to suspect that the actual gap was longer, it cannot be said that *no* competent police officer would have believed that probable cause existed here, even without further investigation. Finally, even if (as suggested above) a reasonable officer might have sought to verify the bank's representations before acting upon them, plaintiff has offered no basis for concluding that *no* reasonable officer could seriously have taken those representations at face value.[6] Whatever doubts the Court may harbor about whether the investigators should have sought to independently verify the bank's information, the Court cannot say that this is a question that brooks no reasonable disagreement.

6. Similarly, with respect to Liser's continued detention, plaintiff has not established or even suggested that Detective Smith knew the information in the supporting affidavit was false, or that it was unreasonable for him (and his team) to have believed that information. *See supra,* n. 5. As such, defendant's actions in preparing the affidavit are protected by qualified immunity. *See Burk v. Beene,* 948 F.2d 489, 494–95 (8th Cir.1991) (holding that it is not objectively reasonable for an officer to prepare an affidavit in support of an arrest where "material information in the affidavit was known by her to be false, or if she had no reasonable basis for believing it.").

**106**

In sum, even if Detective Smith's judgment were mistaken, and the arrest of Liser was not actually supported by probable cause, his conduct is sheltered by qualified immunity from liability under § 1983. The evidence presented does not permit the reasonable inference that defendant's errors were deliberate, that his conclusions about probable cause were unreasonable, or that his decision not to investigate further before arranging for Liser's arrest and continued detention was "plainly incompetent," *Malley*, 475 U.S. at 341, 106 S.Ct. 1092, and for those reasons, Count V must be dismissed.

## VI. Count VI: Intentional Infliction of Emotional Distress

■■■ To establish a prima facie of intentional infliction of emotional distress under D.C. law, a plaintiff must show: (1) extreme and outrageous conduct on the part of the defendant that (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). The conduct contemplated by the first prong of this test must be truly beyond the pale: "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n. 10 (D.C.1994) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). The question on summary judgment is whether, based on the evidence produced, a reasonable jury could find that defendant's conduct was both sufficiently outrageous to satisfy this standard, and whether that conduct was done intentionally to hurt plaintiff, or at least with conscious disregard of his or her emotional well-being. *See Homan v. Goyal*, 711 A.2d 812, 820 (D.C.1998).

■■■ Here, plaintiff's *allegations* regarding defendants' conduct—that Detective Smith and his fellow officers recklessly and intentionally fabricated facts in order to support his unjustified arrest and continued detention (2d Am. Compl.¶ 55)—are sufficient to *state a claim* of intentional infliction. The record, however, simply does not support these allegations, which therefore cannot survive summary judgment. Plaintiff's claim that Detective Smith lied about the evidence against him is based largely on the affidavit submitted in order to justify detaining Liser without bond. In this document, Smith wrote that the Bank of American camera had recorded Liser "using the ATM card and PIN number to $200.00 from the decedent's checking account." (Ex. 10.) It is undisputed that this statement is incorrect. Liser did not use Semino's ATM card or her PIN, and withdrew no money from her account. Nevertheless, not all misstatements are lies; not all false statements are fabrications. And here there is no evidence to suggest that Smith made this mistake deliberately or in blatant disregard of what he actually knew, or indeed, that it was anything other than an honest mistake born of an incomplete investigation. Accordingly, plaintiff's intentional infliction claim cannot survive.

As described above, the detective's error is a perfectly understandable consequence of his assumption that Bank of America's information was accurate regarding the length of the discrepancy between the time stamped by the camera and real time. To support the allegation that Detective Smith intentionally lied or recklessly disregarded the truth, plaintiff would have to point to some evidence implying that he knew or suspected the actual facts to be other than what he put in his affidavit. This they have not done. Even construed

liberally in plaintiff's favor, the record in this case does not warrant a finding that Smith either knew the bank was wrong or had any reason to suspect it. The undisputed evidence is that not until *after* Liser's arrest and detention hearing did the investigators uncover any information that the discrepancy between camera time and real time was greater than fifteen minutes. Before then, neither the bank nor anyone else had suggested that this time-frame was inaccurate. As such, there is no basis for accepting plaintiff's bare allegations of deceit.

The most that can be said about the evidence in this case is that it suggests (perhaps) that Detective Smith may have been negligent in not double checking his information before completing the arrest and filling out the detention affidavit. However, an imprudent failure to verify a fact cannot be equated to a reckless or deliberate lie about the existence of that fact. And an arrest supported by this sort of careless error is simply not sufficiently outrageous to support a claim of intentional infliction of emotional distress. The Court will therefore enter summary judgment in defendants' favor on Count VI.

## CONCLUSION

For the reasons given above, the Court grants defendants' motion for summary judgment as to Counts I, II, V, and VI, but denies the motion as to Counts III and IV.

## *ORDER*

For the reasons given in the attached Memorandum Opinion, it is hereby

**ORDERED** that defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment [63–1 and 63–2] is **GRANTED IN PART** and **DENIED** in part; it is

**FURTHER ORDERED** that Counts I, II, V, and VI of the Second Amended Complaint are **DISMISSED WITH PREJUDICE**; it is

**FURTHER ORDERED** that defendants' motion is **DENIED** as to Counts III and IV of the Second Amended Complaint; it is

**FURTHER ORDERED** that plaintiff's motion for leave to file its Statement of Genuine Material Facts *Nunc Pro Tunc* [72–1] is **GRANTED**; and it is

**FURTHER ORDERED** that defendants' Motion to Strike Plaintiff's Statement of Genuine Material Facts [70–1] is **DENIED**; and it is

**FURTHER ORDERED** that this matter is set down for a status conference on April 25, 2:00 p.m.